FLANAGAN v. DRAINAGE DISTRICT No. 17.

Opinion delivered January 30, 1928.

1. APPEAL AND ERROR—DISMISSAL FOR WANT OF FINAL JUDGMENT.—Where there is no final judgment, no appeal lies, and an appeal will be dismissed under Crawford & Moses' Dig. § 2129, for want of final judgment.

2. APPEAL AND ERROR—TIME FOR APPEAL.—Under Crawford & Moses' Dig., § 2129, an appeal will lie and must be taken from a final decree within the time prescribed by statute for perfecting of appeals.

3. APPEAL AND ERROR—ORDER OVERRULING OR SUSTAINING DEMURRER.—An order overruling or sustaining a demurrer to a pleading without further action is not appealable.

4. APPEAL AND ERROR—FINAL JUDGMENT.—A judgment to be final must dismiss the parties from the court, discharge them from the action, or conclude their rights to the subject-matter in controversy.

5. APPEAL AND ERROR—FINAL JUDGMENT.—In a cross-action by a contractor to recover from a drainage district profits anticipated from the construction work which he lost by alleged breach of the district to carry out its contract, a decree finding the contractor not entitled to anticipated profits held final so as to be appealable, though there was no formal dismissal of the cross-complaint with reference thereto.

6. APPEAL AND ERROR—TIME FOR APPEALING.—Where a decree relative to a cross-complaint merely disposed of such pleading, an appeal from such decree must be taken within six months, as provided by Crawford & Moses' Dig., § 2140.

7. DRAINS—SUBSTITUTION OF NEW CONTRACT.—Substitution by the parties to a contract for the purchase of drainage district bonds, of a new oral contract for the previous one, held to have relieved both parties from the obligation of the original contract.

8. DRAINS—DAMAGES FOR BREACH OF CONTRACT.—Damages for breach of a contract for the purchase of drainage district bonds should be estimated as of the time the breach occurred.

9. EQUITY—OBLIGATION OF PLAINTIFFS TO DO EQUITY.—He who seeks equity must do equity.

10. DRAINS—REIMBURSEMENT OF CONTRACTORS.—Where contractors had made arrangements with the drainage district to complete a drainage project, but, after the contractor had done work and expended money in preparation for performing the job, the district refused to proceed under the contract, *held*, in a suit by taxpayers to cancel the contract, the drainage district should be required to remunerate the contractor for the work he had done and the outlay made in endeavoring in good faith to perform the contract before he was apprised of its abandonment.

11. PARTIES—WHEN OBJECTION INTERPOSED TOO LATE.—Defense that a cross-complainant was not the real party in interest is a plea in bar which should have been interposed in the answer to the cross-complaint.

12. CORPORATIONS—WAIVER OF ISSUE OF CAPACITY TO SUE.—By answering the cross-bill of a cross-complainant, cross-defendants thereby waived any issue they might have raised as to the cross-complainant's incapacity to sue because the nonresident corporation was not qualified to do business in the State.

Appeal from Mississippi Chancery Court, Chickasawba District; *J. M. Futrell,* Chancellor; affirmed.

*J. T. Coston,* for appellant.

*Trieber & Lasley* and *Coleman & Riddick,* for appellee.

WOOD, J. Drainage District No. 17 in Mississippi County, Arkansas, was a very large district, created by act No. 103 of the Acts of 1917, p. 485. The plans of the district showed that it would require many drains or ditches to complete the project. Among these was a ditch or drain designated as Improvement No. 48, which hereafter, for convenience, will be so called, which would drain approximately seventy thousand acres of the district.

On the 15th of July, 1920, a contract was entered into by one J. T. Flanagan and District No. 17 for the construction of improvement No. 48 as called for by the plans. On February 8, 1921, Flanagan assigned the contract to the Harding Construction Company, a Minne-

sota corporation, and on the same day the Harding Construction Company in turn assigned a two-thirds interest in the contract to Andrew and Toleff Jacobson, and they in turn conveyed a one-sixth interest in the contract to J. O. and A. G. Shuland. On the 10th of October, 1921, after Flanagan had done considerable clearing on the right-of-way under the contract, and was ready to commence excavation, he was notified by the directors of the district that his contract would not be carried out by the district.

In December, 1920, J. R. McGibbon entered into a contract to purchase $450,000 worth of the bonds of the district. John R. McGibbon was manager of the Northwestern Mortgage & Security Company of Fargo, North Dakota, which the Jacobsons controlled. The contract for the purchase of the bonds was in his name, but he was buying the bonds for the company he was managing. On November 7, 1921, Baker and Shepherd, two landowners in the drainage district, filed a bill in the chancery court of Mississippi County against Flanagan and his associates and McGibbon and his associates, and later filed an amended complaint in which it was alleged:

(1) That Flanagan was in reality the purchaser of the bonds, and that the two contracts were let at one and the same time, one being the consideration for the other; (2) that the construction contract was let privately, for an exorbitant price, without competition; (3) that an error of two feet was made in establishing the levels of Improvement No. 48; (4) that, on account of said error, Improvement District No. 48 would not give the relief intended to be given to the landowners; and (5) that, if the plans were changed so as to construct Improvement No. 48 deep enough to give the relief intended, it would be so deep that it could not be maintained, owing to quicksand and other defects in the soil.

The complaint and amended complaint both concluded with a prayer for the cancellation of both contracts, and that Flanagan be enjoined from attempting

to enforce his contract, and that some sum be fixed by this court, to be deposited with the court by Drainage District No. 17, to protect the same J. T. Flanagan in any judgment for damages that he may secure in this cause for breach of said contract, heretofore set out, in the event it should be finally determined that said contract was a valid obligation on the part of said Drainage District No. 17. Flanagan and his associates and McGibbon and his associates filed an answer, denying all charges of fraud and irregularity in letting the contracts, and embodied in the answer a cross-bill against the district, concluding with a prayer for an injunction enjoining the district from annulling its contract. Later an amendment was filed by the defendants to their cross-complaint, in which they reaffirmed the allegations of the original cross-complaint and alleged that the district had abrogated its contract with Flanagan and had repudiated its contract with McGibbon for the sale of $450,-000 worth of the bonds of the district, and had sold and delivered these bonds to other parties; that, if Flanagan and his associates had been allowed to perform the contract, they would have realized a profit of $300,000 net, and if McGibbon and his associates had been allowed to purchase the bonds in accordance with the provision of his contract, they would have realized a net profit of $75,000. McGibbon and his associates therefore prayed judgment in that sum against the district for a violation of the contract for the sale of bonds to McGibbon, and Flanagan and his associates prayed judgment in the sum of $300,000 for the violation of the construction contract with the district for the construction of Improvement No. 48.

The district answered the complaint of the plaintiff, admitted its allegations, and denied the allegations of the cross-complaint, and prayed for cancellation of the construction and bond contracts.

Issues were joined by a denial by the defendants of the allegations of the amendments to the amended or supplemental complaint of the plaintiffs, except the dis-

trict admitted, as stated, the allegations of the complaint, and denied the allegations of the cross-complaint; and there was also an answer of the plaintiffs to the allegations of the cross-complaint and amended cross-complaint, in which the allegations of these pleadings were denied.

On November 7, 1921, a temporary injunction was issued restraining the district, its commissioners and Flanagan from carrying out the provisions of the contract for the construction of Improvement No. 48, and restraining the district from paying to Flanagan any sum of money in settlement or adjustment, as damages, for the breach of such contract, and restraining Flanagan, his agents, attorneys and employees, from instituting any separate action seeking to recover damages from the district, or to interfere or prevent the district from selling or delivering the bonds.

A large volume of testimony was taken, fully developing the facts on the issues joined.

On September 24, 1923, the chancery court of Mississippi County, through its chancellor, J. M. Futrell, rendered the following decree:

"This cause coming on for final hearing, come all of the above-named parties by their respective solicitors, and the cause is submitted to the court on the pleadings filed therein, with the exhibits thereto, and on the depositions of the witnesses filed in this cause, with the exhibits thereto, and the court, after argument of counsel, being well and sufficiently advised in the premises, finds that the contract entered into by and between J. T. Flanagan and the board of directors of Drainage District No. 17 of Mississippi County, Arkansas, dated July 15, 1920, was a valid contract at the time it was entered into, but that Drainage District No. 17 subsequently became entitled to rescind the said contract on account of legal impossibility of performance, subject to its liability to reimburse the said J. T. Flanagan for all expense incurred by him in making the necessary preparations to perform and carry out said contract up to the date he had knowledge of the

fact that the district would not permit him to carry out said contract, together with the contract price of any work done by him under the contract up to said date, and including any damages sustained by him in connection with the performance of the contract up to said date, but not including anticipated profits on materials not furnished or work done.

"Wherefore it is considered, ordered, adjudged and decreed that the injunction heretofore issued restraining the parties from carrying out the contract referred to be and the same is hereby made perpetual, and that the cross-complainants, J. T. Flanagan, J. R. McGibbon, Toleff Jacobson, Andrew Jacobson, J. O. Shuland, A. G. Shuland and Harding Construction Company, have and recover of and from Drainage District No. 17 of Mississippi County the contract price for all work actually done by them in performance of the contract referred to up to the time the said J. T. Flanagan had knowledge of the fact that the drainage district would not permit the said contract to be carried out, together with all expenses necessarily incurred by said parties preparing to carry out and perform said contract prior to the time referred to, including any damages sustained by them in performance of said contract up to said time, the amount of the recovery to be determined hereafter by the court or by the master to be appointed by the court; it is further ordered that such amount shall be determined from the evidence already submitted in the cause, and from such additional evidence and testimony as the parties may see fit to produce on such issue, and jurisdiction of this suit is hereby retained until such issue is finally disposed of.

"The question of liability as between John R. McGibbon, Toleff Jacobson and Andrew Jacobson on the one side, and Drainage District No. 17 on the other, on the contract for the purchase of $450,000 of the district bonds at par, and the damages, if any, for the failure to carry out said contract, is reserved for future decision. The question of costs is also reserved for future decision.

"Archer Wheatley, Esq., is hereby appointed special master in this cause, and the issue noted above is hereby referred to him. He is hereby given the usual powers of a master, and is directed to ascertain and determine the facts with reference to said issue, and to report his findings of facts to the next term of this court, or either to the chancellor in vacation, if possible.

"The question of the liability of J. T. Flanagan and the other cross-complainants for interest on the $100,000 of the district's funds which were held by the bond purchasers, pursuant to the order heretofore made in this cause, is expressly reserved for future decision. It is further ordered that the said $100,000 remain *in statu quo* for thirty days from this date, during which time the said Flanagan and the other cross-complainants may give a good and solvent bond to be approved by the court or master, conditioned to pay the district legal interest on said sum or such parts thereof as they may designate until the final disposition of this cause, and further conditioned as required by law for injunction bonds, and, if such a bond is given within the specified time, the said sum, or such part thereof as said parties shall designate, shall be held as now held under the order referred to until the cause is finally disposed of. If no bond is given as provided herein, or if the parties designate less than the full amount of said sum, the said $100,000, or the excess of such sum over the amount designated, shall be released from the order above referred to and may be made by the parties now holding it to the said district."

The special master made his report, in which, among other things, he states:

"The special master was appointed with directions to state an account on the basis of the actual loss sustained by the contractor, without considering any anticipated profits whatever. This is the theory on which this report has been made up.

"For the convenience of the court and interested parties, the different classes of items have, in a way, been separated. Improvement No. 57, which was com-

pleted just prior to the work of overhauling the dredge-boat for Improvement No. 48, was finished about July 15, 1921. The testimony offered by the district would indicate there was no serious opposition on their part to the allowance of all expenses incurred between July 15 and October 10, the date on which the contractor was notified the district would not have ditch No. 48 dug. A list of the alleged expenses incurred in the overhauling of the boat prior to July 15 was put in evidence. Some of these were eliminated by the contractor. There were 123 items of these expenses. It appeared from the books of the Harding Construction Company that items 1 to 37 had been charged to Improvement No. 57, and had never been credited to that improvement and recharged to No. 48. The district therefore contends that none of these items are properly chargeable to No. 48. As to a large number of these items, the evidence of witnesses is otherwise undisputed that the material called for by the invoices was actually used after July 15, and for this reason the special master has given the contractor credit for these items, but has separated the amount, so that, if his finding in this respect is erroneous, it may be easily corrected.

"As above stated, the district gave notice on October 10, 1921, that the ditch would not be dug. It contends that the contractor should therefore have stopped all expense of every kind and nature on that day, and that it (the district) is not chargeable with anything thereafter. The special master thinks this is an arbitrary position to take, and that the contractor should be allowed a reasonable time in which to adjust matters following this breach of the contract. If a reasonable time is given, the termination of its length must be made without reference to any mathematical basis. The master has arbitrarily adopted sixty days, and has therefore allowed the contractor expenses incurred up to December 10, 1921. The contractor, on the other hand, did not sell the boat until April, 1922, and says credit should be given for all expenses up to that date."

After considering the testimony on the issue submitted to him, the master sets forth in his report an elaborate account of items, which it is unnecessary to here set forth in detail. He states the total indebtedness of the district to the contractor in the sum of $33,129.62, and allows the district a credit of $7,922.50, leaving a net balance due the contractor by the district of $25,207.12. The plaintiffs and District No. 17 filed exceptions to the following items of the master's report:

"(1)  To the allowance of item No. 87 for $319, covering the traveling expenses of Jacobson and Flanagan on trips south. (2) To the allowance of $6,800 for rent or usable value of dredgeboat from July 15 to October 10. (3) To the allowance of $4,800 covering the rent or usable value of dredgeboat from October 10 to December 10. (4) To the allowance of $833.32 covering the item of supervision or overhead from October 10 to December 10. (5) To the allowance of $708.20, the amount of the insurance premium covering insurance on the boat from July 16 to December 10. (6) To the allowance of item No. 81, $68.30, covering traveling expenses of Toleff Jacobson to Chicago."

The district also excepted and objected to the allowance of any of the items set forth in the master's report as against it, on the ground that all proof taken before the special master on the statement of the account showed that the Harding Construction Company is a Minnesota corporation, and, at the time of the making of the repairs upon the boat and the expenditures of the items which are charged to the drainage district, the Harding Construction Company, which made the repairs, was doing business in violation of the laws of the State of Arkansas, the same being a foreign corporation which had not been authorized to do business in the State.

The cross-complainants excepted to the report of the master on the following grounds:

(1)  No allowance is made in favor of the cross-plaintiffs for the accrued interest on the $450,000 worth of bonds which Drainage District No. 17 sold and refused

to deliver to cross-plaintiffs. (2) The master did not allow the cross-plaintiffs the rental or usable value of the dredgeboat up to the time of the sale of the same. (3) The report does not allow the cross-plaintiffs anticipated profits on the contract for the construction work, which Drainage District No. 17 repudiated and refused to carry out.

On the 27th of September, 1926, the court entered the following decree:

"On this day, September 27, 1926, this cause coming on to be heard, came the plaintiffs, W. H. Baker *et al.*, by their attorneys, Little, Buck & Lasley, and defendants, Drainage District No. 17 *et al.*, by their attorneys, Charles T. Coleman and Little, Buck & Lasley, and the defendants, J. T. Flanagan *et al.* (who are also cross-plaintiffs), by their attorney, J. T. Coston, and this cause was heard on the exceptions of Drainage District No. 17 and its directors, and the exceptions of the cross-plaintiffs to the master's report, and, upon due consideration of the same, it is considered, ordered, adjudged and decreed that all said exceptions to the master's report be and the same are hereby overruled; to which action of the court in overruling their exceptions to said report said Drainage District No. 17 and its directors excepted at the time, and said cross-plaintiffs, J. T. Flanagan *et al.*, excepted at the time to the action of the court in overruling their exceptions to the master's said report.

"It is further considered, ordered, adjudged and decreed that the complaint of the plaintiffs, W. H. Baker and E. H. Sheppard, be and the same is hereby dismissed.

"It is further considered, ordered, adjudged and decreed that the cross-plaintiffs, J. T. Flanagan, J. R. McGibbon, Toleff Jacobson, Andrew Jacobson, J. O. Shuland, A. G. Shuland and Harding Construction Company, do have and recover of and from Drainage District No. 17 of Mississippi County, Arkansas, the sum of $32,515 (the amount found due by the master, with interest thereon), and all cost, including a fee of $1,000 in favor of Hon. Archer Wheatley for his services as mas-

ter, but the respective interests of said cross-plaintiffs in the recovery are not hereby fixed or determined.

"It appearing that in the original decree herein rendered on the................day of..........................., 1923, there was a finding that cross-complainants, J. T. Flanagan *et al.,* were not entitled to any damages for anticipated profits on the construction contract or for breach of contract for sale of the bonds, but there was no formal dismissal of the cross-complaint with reference thereto, said cross-complaint with reference to said features is dismissed for want of equity, exceptions of cross-complainants thereto being saved.

"It is further considered, ordered and adjudged that this decree shall draw interest from this date until paid at the rate of 6 per cent. per annum, and R. C. Rose, C. E. Crigger and B. A. Lynch, the present board of directors of said Drainage District No. 17, be and they are hereby ordered, directed and required to issue all vouchers, checks or warrants necessary to satisfy this decree, with costs.

"To which judgment and decree of the court Drainage District No. 17 excepted at the time, and prayed an appeal to the Supreme Court, which is granted.

"To which judgment and decree of the court the cross-plaintiffs excepted at the time, and prayed an appeal to the Supreme Court, which is granted."

1. The appellants contend that District No. 17 is liable to Flanagan in damages for anticipated profits for breach of a valid contract entered into between the district and Flanagan for the digging or construction of Improvement No. 48. But appellees contend that the decree of 1923 was final and conclusive of that issue, since there was no appeal from that decree within the time prescribed by law. In other words, the appellees contend that the appeal lodged here on the issue as to anticipated profits should be dismissed. That issue therefore must be determined *in limine.*

Section 2129 of C. & M. Digest provides as follows: "The Supreme Court shall have appellate juris-

diction over the final orders, judgments and determinations of all inferior courts of the State," etc.

The above provision is § 15 of the Civil Code, as amended by the Acts of 1871, the words "and determinations" and "inferior courts of the State" being added by the Legislature of 1871. This court has always held, before and ever since the adoption of the Code (1869), that, where there is no final judgment, no appeal lies, and that an appeal will be dismissed for want of a final judgment. See *Adams* v. *Owens,* 1 Ark. 135; *Bailey* v. *Ralph,* 4 Ark. 591; *Campbell* v. *Sneed,* 5 Ark. 398; *Ex parte Hawley,* 24 Ark. 596; *Mirror* v. *O'Brien,* 36 Ark. 200; *Davie* v. *Davie,* 52 Ark. 224, 12 S. W. 558, 20 Am. St. Rep. 170; *Davis* v. *Hale,* 114 Ark. 426, 170 S. W. 99, Ann. Cas. 1916D 701; *Darbin* v. *Montgomery,* 144 Ark. 153, 221 S. W. 855, 223 S. W. 17. Other cases are cited in 1 Crawford's Arkansas Digest, at page 130. But this court has likewise always held, and it necessarily follows, that, under the above statute, an appeal will lie and must be taken from a final decree within the time prescribed by statute for the perfecting of appeals. So the issue on the motion of appellees to dismiss the appeal of appellants as to anticipated profits is whether or not the decree of September 24, 1923, is final.

What is a final decree? This court, in numerous cases, beginning as early as *Campbell* v. *Snead, supra,* and on down as late as *Temple Cotton Oil Co.* v. *Davis,* 167 Ark. 449, 268 S. W. 38, has held that an order overruling or sustaining a demurrer to a pleading without further action is not appealable. See also *Moody* v. *Jonesboro, etc. Ry. Co.,* 83 Ark. 371, 103 S. W. 1134; *Fairview Coal Co.* v. *Ark. Central Ry. Co.,* 153 Ark. 295, 239 S. W. 1058.

This court, in *Campbell* v. *Snead, supra,* in giving its reasons for declaring such a judgment not final, said:

"Because it neither in form nor effect dismisses the parties from the court, discharges them from the action, *or concludes their rights in respect to the subject-matter in controversy in the case;* and no proceeding in court,

not attended with at least one of these consequences, can, in our opinion, be considered as embraced by the law allowing 'writs of error upon any final judgment or decision of any circuit court'."

In *State Bank* v. *Bates,* 10 Ark. 633, we said:

"A judgment, to be final, must dismiss the parties from the court, discharge them from the action, *or conclude their rights to the subject-matter in controversy.*"

And in *Tucker* v. *Yell,* 25 Ark. 420-429, we quoted Bouvier's definition of a final decree as follows: "A final decree is that which finally disposes of the whole question so that nothing is left to adjudicate upon."

It is further held in that case, quoting syllabus:

"In peculiar cases this court may decree as to certain defendants or property, while all the equities as to other defendants and property are reserved for further consideration; and yet this decree, as to certain defendants or property, may be final. If, in the course of the proceedings, final decrees vital to the interests of any of the litigants are made, an appeal may be had."

In *Marlow* v. *Mason,* 117 Ark. 360-362, 174 S. W. 1163, we quoted the language quoted from the case of *State Bank* v. *Bates, supra.*

In *Davie* v. *Davie, supra,* it is said: "But the unnecessary splitting of causes by courts of chancery creates confusion and difficulty in practice, and is condemned." Citing cases, among them *Tucker* v. *Yell, supra.*

Learned counsel for the appellants cites and relies upon Arkansas cases to support his contention that the decree of September 24, 1923, was not a final decree, and he cites numerous cases from other jurisdictions, which, he also maintains, support his contention, if the court desires to pursue its investigation further than our own decisions. We have examined all the cases on this issue from our own court cited and relied on by counsel both for appellants and appellees, and find it unnecessary to investigate the decisions of other courts; for we have concluded that the issue is clearly settled against the

appellants by decisions of our own court. This court has never departed from the doctrine announced in *Campbell* v. *Sneed, State Bank* v. *Bates,* and *Yell* v. *Tucker, supra,* to the effect that, where a decree concludes the rights of the parties to the action in respect to the subject-matter in controversy in the case, it is a. final decree. That doctrine, announced so early, has been reaffirmed expressly and in legal effect in all subsequent cases.

In *Davie* v. *Davie, supra,* a leading case on the subject, it is said: "An appeal is allowed also *where a distinct and several branch of the case is finally determined, although the suit is not ended.*" See also *Seitz* v. *Meriwether,* 114 Ark. 289, 169 S. W. 1175, where it is. held, quoting syllabus: "A decree which disposes of all the matters in issue between the parties and gives all consequential directions necessary to carry it into execution, is a final decree."

In *Young* v. *Rose,* 80 Ark. 513, 98 S. W. 370, it is said:

"A decree which settles the rights of parties and leaves nothing to the master but a statement of an account on a basis fixed by the decree, is a final judgment. A report of a master is not subject to exceptions when it simply follows the decree directing the reference and makes a report based on findings contained in such decree, as, if there be error, it is in the original decree, and not in the report of the master, whose duty it was to obey the decree."

In the comparatively recent case of *Newald* v. *Valley Farming Company,* 133 Ark. 456, 467, 202 S. W. 838, 841, we quoted from *McGourkey* v. *Toledo & Ohio Central Ry. Co.,* 146 U. S. 536, 13 S. Ct. 170, 36 L. ed. 1079, as follows:

"It may be said in general that, if the court make a decree fixing the rights and liabilities of the parties, and thereupon refers the case to a master for a ministerial purpose only, and no further proceedings in a court are contemplated, the decree is final; but, if it refers the case to him as a subordinate court and for a judicial purpose, as to state an account between the

parties, upon which a further decree is to be entered, the decree is not final.''

And also, in the same case from Jones on Mortgages, vol. 3, par. 1600, the following:

''A judgment which settles all the rights of the parties and directs a sale of the premises, and that the defendant pay any deficiency which may arise after such sale, is a final decree from which an appeal may be taken; though, in a limited sense, it is interlocutory, inasmuch as further proceedings are necessary to carry it into effect. It leaves nothing further to be adjudicated.''

In *Lewisburg Bank* v. *Sheffey*, 140 U. S. 445, 11 S. Ct. 755, 35 L. ed. 493, it is said:

''Where the entire subject-matter of a suit is disposed of by a decree, the mere fact that accounts remain to be adjusted and the bill is retained for that purpose, does not deprive the adjudication of its character as a final and appealable decree.''

Now, when the above rule of our court and of the Supreme Court of the United States is applied to the decree of September 24, 1923, it is impossible to escape the conclusion that the same was a final decree on the issue as to whether Flanagan and his associates were entitled to recover anticipated profits by reason of the alleged breach of contract on the part of the district for the construction of No. 48. It must be remembered that this issue was not determined on demurrer to the answer and cross-complaint of appellants, but on the merits of the issue as raised by such answer and cross-complaint after the allegations thereof had been denied by the plaintiffs and after proof on the issue thus raised had been fully developed. The recitals of the decree show that it was rendered on final hearing and determined on this issue. We will not set out again all of the recitals of the decree. The court, after finding that the original contract was valid, found that the district was entitled to rescind the same on account of impossibility of performance, and that it was only liable to Flanagan and his associates for the expenses incurred in making prep-

arations to perform the contract up to the time that he was notified by the district that it would not carry out the contract, including all damages sustained by him in connection with the performance of the contract to that date, but *"not including anticipated profits on materials not furnished or work done."* The decree recites: "Wherefore it is considered, ordered, adjudged and decreed that the injunction heretofore issued restraining the parties from carrying out the contract referred to be and the same is hereby made perpetual." In other words, the court found that the appellants could never recover from the district any damages by way of anticipated profits, and entered a decree so holding. A reading of the whole decree will show that it was a final disposition of that issue. Nothing whatever was left to be determined concerning such issue. On the contrary, the court, by expressly reserving other issues and giving the master specific directions to take proof and make his report at a future term of the court with reference to the sole and only issue submitted to him as designated in the decree of September 4, 1923, completely, without reservation, and finally disposed of the issue of anticipated profits for alleged breach of the contract for the construction of No. 48. After entering the decree in this form, it was wholly immaterial that the court did not have the decree recite that the complaint of the appellants on the issue of anticipated profits was dismissed. If the cause on this issue had been disposed of by sustaining a demurrer to appellants' cross-complaint, then, in order to make the decree final, it would have been necessary for the record of the decree to recite that the appellants, cross-complainants, stood on their cross-complaint, and that the same was dismissed. But, as already stated, the cause on this issue was not determined on demurrer to the cross-complaint, but the issue was joined by answer to the allegations of the cross-complaint and fully developed by the taking of testimony, and finally submitted and determined on its merits. Therefore the decree as actually rendered was tanta-

mount to a dismissal of appellants' cross-complaint on the issue of anticipated profits, and as completely and effectually disposed of it as if there had been a formal recital in the decree dismissing the cross-complaint for want of equity; because · all parties were forever restrained from carrying out the contract for construction of No. 48, and it was decided that the appellants were not entitled to damages by way of anticipated profits because the district would not allow the appellants to complete the construction of No. 48 under the contract. The issue therefore as to anticipated profits for this alleged breach of contract was finally disposed of by the decree of 1923.

Both the master and the court itself so construed the decree. The report of the master states that ''he was appointed with directions to state an account on the basis of the actual loss sustained by the contractor, without considering any anticipated profits whatever,'' and the recitals of the decree of September 27, 1923, in which the court states: ''It appearing that, in the original decree herein rendered on the ............ day of .................................... 1923, there was a finding that cross-complainants, J. T. Flanagan et al., were not entitled to any damages for anticipated profits on the construction contract or for breach of contract for sale of the bonds, but there was no formal dismissal of the cross-complaint with reference thereto,'' etc. After the lapse of the term when the decree on the issue of anticipated profits was rendered, that decree became final. Spivey v. Taylor, 144 Ark. 301, 222 S. W. 57. When therefore the appellants failed to perfect their appeal from the decree of the court on the issue of anticipated profits within the six months prescribed by § 2140 of C. & M. Digest, they forever lost their right to prosecute an appeal on that issue. Consequently their so-called appeal on that issue must be, and is, hereby dismissed.

2. It is next contended by appellants that the district is liable for accrued interest on $450,000 worth of the bonds which appellants allege the district sold and refused to deliver to appellants. On the 15th day of

July, 1920, the district entered into a contract with J. R. McGibbon for a purchase of $450,000 worth of bonds of the district bearing interest at the rate of 6 per cent. payable semi-annually, and to be dated August 2, 1920. The contract was assigned to Jacobson. The purchaser was to pay for the bonds in the sum of $450,000 for Improvement No. 48, as the payrolls for the construction of such improvement were due. The appellees contend that the construction contract is voidable because it was not let publicly, as the statute requires, and further, that the construction contract was excessive, and therefore voidable; and still further, that the construction contract and bond contract were coupled and interdependent, and therefore voidable.

We have considered the testimony in the record bearing upon these contentions of the appellees, but we do not set out and discuss it, because it is exceedingly voluminous and would unduly extend this opinion to do so. Besides, it is wholly unnecessary to do so, inasmuch as we have concluded that, if these contentions of counsel for appellees were unsound, still there could be no recovery by the appellants for breach of the bond contract for two reasons: (1) because the undisputed evidence shows that the district was released by the Jacobsons from the obligations of the bond contract; (2) if the district was not released from the bond contract, and if there was a breach of the contract, nevertheless there could be no recovery of damages, because the appellants sustained no loss on account of such breach.

The facts, briefly stated, on the alleged breach of the bond contract are substantially as follows: The district had made a tentative agreement with Carbough & Company, bond buyers, of Chicago, for the purchase of $2,330,000 worth of bonds, but the tentative purchasers were unwilling to take any of the bonds of the district unless $450,000 worth of bonds which the district had contracted to McGibbon were included in the purchase. Lange, the secretary of the district, arranged a meeting in Chicago with Jacobson for the purpose of arranging

for the sale of the bonds of the district, including the bonds contracted to McGibbon. The result of the meeting was that the Jacobsons agreed that "if they were relieved of the burden of purchasing $450,000 worth of bonds at par, a reduction should be made in the contract price for constructing No. 48." They were *relieved,* and the bonds that were to be purchased by the Jacobsons were sold by the district on November 9, 1921, to a St. Louis syndicate at 85c on the dollar. While Lange testified that the district and the Jacobsons never reached an agreement about the extent of the reduction that the board should receive on the construction contract, there is no uncertainty in his testimony, and no contradiction thereof, that the Jacobsons were relieved, by agreement with the district, of the obligations of the contract for the purchase of the bonds. The substitution of this new contract, by oral agreement concerning the purchase of the bonds, necessarily relieved both parties from the obligations of the original contract for the purchase of bonds. Furthermore, the testimony shows that, during the time negotiations were pending for their sale and purchase, the bonds had a market value ranging from 85c to 93c, or an average market value of about 90c. The district notified the contractor, October 10, 1921, that the contract for the construction of Improvement No. 48 would not be carried out. The bonds were to be dated August 2, 1920, and they bore interest at the rate of 6 per cent. per annum, payable semi-annually, therefore fourteen months' interest had accrued at the time the contract was repudiated. If there was a breach of the contract for the purchase of the bonds, the damages for such a breach should be estimated as of the time the breach occurred, because the right of action, if any, accrued at that time. Now, if the Jacobsons had been required to take the bonds, they would have had to pay $450,000, but the market value of the bonds at the time of the alleged breach of contract for their purchase, calculated 93c on the dollar, the highest estimated market value shown by the evidence, would be $418,000; this, including the inter-

est on $450,000 (which the Jacobsons were entitled to) from August 2, 1920, the date of the bonds, to October 10, 1921, the date of the alleged breach of contract, would amount to $31,500 which, added to $418,000, would make the market value of the bonds and the interest equal to $449,500. Therefore, by simple mathematical calculation, it is demonstrated that Jacobson was *not* damaged by breach, if any, of the bond contract, *but,* on the contrary, he gained instead of lost by such breach.

3. This brings us, in conclusion, to determine whether or not the court erred in overruling all exceptions to the master's report and in rendering judgment against the district in the sum of $32,515.

In its decree of 1923 the court found that the contract for the construction of No. 48 was valid, but that the district subsequently became entitled to rescind the contract on account of legal impossibility of performance, and directed the master to ascertain the expense that Flanagan, the contractor, had incurred in necessary preparation to perform and carry out the contract, and also the contract price of any work done by him, including any damage sustained by him in connection with the performance of the contract to the date when he was notified that the district would not permit him to carry out the contract.

Counsel for appellants and appellees have favored the court with an exceedingly elaborate brief on the issues as to whether or not the construction contract was valid when entered into, and also on the issue of whether, if valid, the district had the legal right, under the act February 23, 1920, to abandon the performance of the contract.

Here again we regard a decision of these issues as wholly immaterial, and we therefore pretermit a discussion thereof, for the reason that we are convinced that the district is liable to the contractor on the matters involved in the issue referred to the master, under the plainest principles of equity, whether the district had the discretion to abandon the contract or not.

Flanagan and the district entered into the contract believing the contract was valid. Flanagan made preparations for, and entered in good faith upon, the performance of the contract, and was engaged in such performance when he was notified by the district that it would not further perform the contract on its part. Conceding, without deciding, that the district had a perfect right to thus repudiate the contract, equity would not allow it to do so without reimbursing the other party to the contract for the necessary expense incurred by him in the performance of the same.

"If a party calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases to do equity in order to get equity." *Spring F. Company* v. *School Dist. No. 4, Faulkner County,* 67 Ark. 236, 54 S. W. 217. In *McMillan* v. *Brookfield,* 150 Ark. 518, 234 S. W. 621, we said:

"This suit is in equity, and the court has the right to impose conditions upon the plaintiffs in granting them the relief prayed for. He who seeks equity must do equity, is a favorite maxim. In the broadest sense it is regarded as the very foundation of all equity and as the source of every doctrine and rule of equity jurisprudence. Its practical meaning is that, whatever be the nature of the controversy and of the remedy demanded, the court will not give equitable relief to the party seeking it unless he will admit and provide for all the equitable rights, claims and demands of his adversary growing out of, or necessarily involved in, the subject-matter of the controversy. I Pom. Eq. § 385." See also *Grider* v. *Driver,* 46 Ark. 64; *Comstock* v. *Johnson,* 46 N. Y. 521; *Hitchcock* v. *Galveston,* 96 U. S. 350, 24 L. ed. 659, and other cases cited in appellant's brief.

Under all the circumstances disclosed by this record, it occurs to us that it would be rank injustice upon the part of the district to fail to remunerate Flanagan and his associates for their necessary outlay in endeavoring

in good faith to perform the contract on their part, even though the district was justified in abandoning the same. As a part of said outlay, the master correctly concluded, that the contractor should be allowed at least sixty days to rearrange its affairs and should be reimbursed the amount necessarily expended in doing so. It must be remembered that this was a stupendous project, and a sudden termination of the contract made it necessary for the contractor to incur a large expense in readjusting his affairs to meet the situation caused directly by the act of the district in repudiating its contract.

But the appellees contend that the Harding Construction Company was in fact the real party in interest in this litigation, it being the exclusive owner of the contract and the real contractor which was to do the construction work. One of the exceptions of the appellees to the master's report is that the Harding Construction Company is a Minnesota corporation, and was doing the business contemplated by the contract under review in violation of the laws of Arkansas, not being authorized to do business in the State. Conceding that the Harding Construction Company was the real party in interest, the trial court did not err in overruling this exception to the master's report. This, in effect, was a plea in abatement, or rather a plea in bar, of the appellant's action as set forth in their answer and cross-complaint, and the appellees should have entered their plea in their answer to such cross-complaint or by special plea in bar at the beginning of the lawsuit, instead of at the end thereof. About two and one-half years after the district filed its answer denying the allegations of appellant's cross-complaint, and after proof on the merits of the issues thus joined had been taken, the original plaintiffs in the action file an amendment to their amended complaint, alleging, for the first time, that the Harding Construction Company was not qualified to do business in Arkansas. This was too late for a plea in abatement, or in bar of the action. The appellees must be held to have waived the incapacity of the Harding Construction

Company to maintain its cross-action by answering this cross-complaint and permitting the proof to be developed on the merits, without raising the issue of incapacity of the cross-complainant, Harding Construction Company, to maintain the action. See § 1189, C. & M. Digest, subdiv. 2; also § 1192, C. & M. Digest. See also *Pettigrew* v. *Washington County,* 43 Ark. 41; *Files* v. *Reynolds,* 66 Ark. 316, 50 S. W. 509; *Triggs* v. *Ray,* 64 Ark. 151, 41 S. W. 55, and cases from other jurisdictions cited in brief of counsel for appellant.

The master was a former chancellor of the district, and his report and its exhibits cover fifteen pages of the record. It could serve no useful purpose to set out and discuss the evidence upon which the master based his findings, as only questions of fact are mainly involved. The report of the master shows that he was thoroughly capable, and that he apprehended fully the directions of the court. He made a painstaking and exhaustive examination of the evidence already in the record, and took further testimony on the issue submitted to him.

After a careful consideration of the master's report, we have reached the conclusion that the same is correct, and that the trial court did not err in overruling all the exceptions thereto, and did not err in approving the same and rendering a decree in accordance therewith. We find no error in the entire record calling for a reversal of the decree, and the same is therefore affirmed.